UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

00 JUN -5 PM 3:58

U.S. ............ COURT
N.D. OF ALABAMA

DEBBIE A. BROWN,                    )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )   Civil Action No. CV-98-S-3038-NE
                                   )
FORTIS BENEFITS INSURANCE          )
COMPANY,                           )   **ENTERED**
                                   )
        Defendant.                 )   JUN   5 2000

## MEMORANDUM OPINION

Plaintiff commenced this action on December 8, 1998, to recover permanent disability benefits under a long term disability insurance policy that was issued by defendant. All parties concede that defendant's insurance policy qualifies as an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). The parties also concede that plaintiff was covered under that policy. The only issue before this court is whether plaintiff's medical condition conforms with the policy's definition of "Total Disability."

This action is before the court on the parties' cross motions for summary judgment. Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes that defendant's motion for summary judgment is due to be denied, and plaintiff's motion granted in part and denied in part.



## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis added.)  The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial.  *See Celotex Corp. v. Catrett* , 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).  The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case.  *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(*per curiam*).  Rule 56 permits the movant to discharge this burden with or without supporting affidavits.  *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.  When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *See Jeffery*, 64 F.3d

2

at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence <u>could</u> draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

When presented cross motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard."  Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2720.  *See also, e.g., Arnold v. United States Postal Service*, 649 F. Supp. 676, 678 (D. D.C. 1986) (Richey, J.).

"[W]e relate all material facts in genuine dispute in the light most favorable to the party resisting summary judgment." *Serrano-Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 24 (1st Cir. 1997) (citing *Sanchez v. Alvarado*, 101 F.3d 223, 225 n.1 (1st Cir. 1996)).

## II. FACTUAL BACKGROUND

Defendant Fortis Benefits Insurance Company ("Fortis") issued a long-term disability insurance policy to the National Society of

4

Volunteers of America ("NSVA").[1]  Plaintiff, Debbie A. Brown, had
been employed with NSVA as a Qualified Mental Retardation
Professional since 1987, and was covered under defendant's policy.[2]
Specifically, plaintiff worked on a program entitled "residential
care for developmentally disabled adults," and "was responsible for
over 60 mentally retarded adults in Hartselle, Decatur, Huntsville
and Scottsboro, Alabama."[3]  Although plaintiff's primary duties
were supervisory in nature, she occasionally was required to assist
in lifting patients.[4]  Plaintiff holds a bachelor's degree in
psychology and sociology from Athens State University.[5]

Plaintiff filed a claim for long term disability benefits under
the terms of defendant's insurance policy On August 6, 1992.[6]  She
described the "nature of her sickness" as a "heart attack" that
occurred on June 20, 1992, which rendered her unable to work.[7]  In
support of her claim, plaintiff submitted a form entitled
"attending physician's statement of disability," which was signed

---

[1] Higgins' Declaration ¶ 2.

[2] *Id.*; *see also* plaintiff's affidavit (doc. no. 21) at 1.

[3] Plaintiff's affidavit at 1; *see also* defendant's exhibit B at 470-471.

[4] Defendant's exhibit B at 469-470.

[5] Plaintiff's affidavit at 1.

[6] Plaintiff argues that the correct date of her application is August 4,
1992, see plaintiff's affidavit at 2, but the court finds the discrepancy to be
immaterial.

[7] Defendant's exhibit B at 492.

by Dr. Alfred W.H. Stanley, Jr., plaintiff's cardiologist.[8]  Dr.
Stanley diagnosed plaintiff with a "S/P anterior myocardial
infarction" and stated that her treatment included "[a] left heart
cath[eter]; [and] left coronary arteriogram."[9]  Dr. Stanley opined
that plaintiff was totally disabled as of the date of her
application, but that he "expect[ed] this [patient] to be
functionally normal in the future!!"[10]  He also indicated that he
"expect[ed] this [patient] to ultimately be able to return to her
usual-full time work."[11]  He classified plaintiff's disability as
a "Class 3-Slight limitation of functional capacity; capable of
light work."[12]

Defendant accepted plaintiff's claim for long-term disability
and began paying her benefits on September 21, 1992.[13]  Defendant's
policy describes the available coverage as follows:

Insurance Provided

If a person, while insured under This Coverage, becomes
Totally Disabled as a result of an Injury, sickness or
pregnancy, We will pay Long Term Disability Insurance
benefits, subject to all the terms and conditions of the
Policy.  Payment of benefits will be made only if:

---

[8] *Id.* at 487.

[9] *Id.*

[10] *Id.* at 486 (emphasis in original).

[11] *Id.*

[12] *Id.*

[13] Higgins' declaration ¶ 10; plaintiff's affidavit at 2.

(i)   The Total Disability continues without interruption for
      the duration of the Qualifying Period, and

(ii)  The Person Insured has not attained age 70 or more on
      the day after the Qualifying Period ends. [14]

Defendant's policy also defines the term "Total Disability" as

follows:

"Total Disability." A Person Insured is considered "Totally
Disabled" if:

(i)    during the first 36 months of any One Period of Total
       Disability, the Person Insured is under the regular care
       and attendance of a Licensed Physician (other than him or
       herself) and completely unable to perform the material
       duties of his or her regular occupation or employment;
       and

(ii)   after the first 36 months of any One Period of Total
       Disability, the Person Insured is completely unable
       to perform the material duties of any and every
       gainful occupation or employment for which the person
       is or becomes reasonably fitted by education,
       training or experience. [15]

The policy limits the benefits available to patients under the

following circumstances:

<u>Limitations</u>

This Coverage provides only limited benefits for:

1.     <u>Alcoholism, Drug Addiction, Chemical Dependency or
       Mental or Nervous Disease or Disorder</u>

       (a)   If the Person Insured is not Hospital Confined,
             he or she will be entitled to benefits for a

---

[14] Defendant's exhibit A at 13.

[15] *Id.* at 12.

>   maximum period of 24 months.  This 24 month
>   maximum is an overall maximum which applies to
>   all periods of disability due to any one or more
>   of the above conditions.  It is not a separate
>   maximum for each of the conditions.[16]

After receiving the initial payment of benefits, plaintiff submitted a letter to defendant indicating that she had an unrelated condition that provided an additional basis for her disability claim.[17] She disclosed to defendant that she underwent a "diskectomy between C-6 and C-7 of [her] cervical spine" in January of 1992.[18] Although she was recovering "quite well" from the surgery, and returned to work the beginning of March, she injured her neck in an automobile accident on March 19th.[19] She stated that she "continuously had problems with [her] neck resulting from the March incident," and that this injury "appears ... to be a more long term disability than that of the heart attack...."[20] She explained:

>   I am currently undergoing both Physical and Occupational
>   Therapy at Lakeshore Rehabilitation Center in Birmingham,
>   Al. and am under the care of Dr. Martin Salmon for the
>   condition of a herniated disk specifically T-2.  Dr. Salmon
>   feels that this is the injury suffered in the March
>   incident.  I remain unable to work for my heart condition
>   until my next visit with the Cardiologist Dr. Alfred Stanley

---

[16] *Id.* at 17.

[17] Defendant's exhibit B at 490.

[18] *Id.*

[19] *Id.*

[20] *Id.*

on October 13, 1992.  However, upon my release from his care
I shall remain under the care of Dr. Salmon or a Neurologist
recommended by him for the problem with my neck.  I am
unable to perform my duties required by my employer until
such time as the condition with my neck improves and I am
released by those physicians involved. [21]

Thereafter, plaintiff submitted a formal addendum to her claim for

benefits on October 21, 1992.[22]  In the addendum, she stated that

"[a]dditional neurological testing will be required for the

problems with my neck."[23]  She also disclosed:

I also remain under tremendous emotional distress.  My
husband was diagnosis [sic] with Thyroid cancer in May,
underwent radical neck discetion in June and is still
recovering.  We filed bankrupcy [sic] October 16th due to my
lack of income and the incredible amount of medical
bills. [24]

After receiving plaintiff's letter and addendum to her claim for

benefits, defendant requested medical records and other information

regarding plaintiff's alleged disability.[25]  In response to this

request, defendant received two attending physician statements.

The first statement was completed on January 14, 1993, by Charles

H. Clark, M.D., a neurosurgeon.[26]  Dr. Clark performed an "anterior

cervical diskectomy for non fusion of C6-C7" on December 15, 1992,

---

[21] *Id.*
[22] *Id.* at 462-63.
[23] *Id.* at 462.
[24] *Id.* at 463.
[25] *Id.* at 479-481.
[26] *Id.* at 441-42.

in addition to inserting a plate in plaintiff's neck.[27]  Although Dr. Clark did not rate the severity of plaintiff's physical impairment, he opined that she was "not fully recovered from surgery at this time," and that she then was not a suitable candidate for rehabilitation services.[28]

Plaintiff also submitted another statement from Dr. Stanley on February 10, 1993.[29]  Dr. Stanley confirmed that plaintiff's diagnosis was two-fold, consisting of coronary artery disease and cervical disc disease.[30]  He also reiterated his earlier opinion that "[t]his lady should ultimate[ly] be able to return to work when heart/cervical spine - Recovery is complete."[31]

Defendant was continually apprised of plaintiff's ongoing medical treatment.  On April 12, 1993, defendant received a letter from Dr. Martin Salmon, a physician employed at Lakeshore Rehabilitation Center.[32]  He acknowledged that plaintiff still had "multiple pain complaints," but opined that she "has reached maximum medical improvement."[33]  On July 19, 1993, defendant

---

[27] Plaintiff's affidavit at 2; defendant's exhibit B at 441.

[28] Defendant's exhibit B at 442.

[29] *Id.* at 435-436.

[30] *Id.* at 435.

[31] *Id.* at 436.

[32] *Id.* at 431.

[33] *Id.*

received another statement from Dr. Stanley, indicating that while plaintiff was disabled from performing her past position, her physical condition did not render her incapable of performing all other jobs.[34]

On July 27, 1993, defendant received the results of a functional capacity evaluation performed on plaintiff on June 29, 1993.[35] The evaluation stated that plaintiff's "physical abilities are currently far below that of the job description of a psychologist for the Volunteers of America."[36] The evaluation also revealed that plaintiff "demonstrated a very relaxed sitting posture and had no difficulty performing the protocol for sitting."[37]   Dr. Salmon contacted defendant on July 27, 1993, after receiving the results of the functional capacity evaluation.[38] He interpreted the results of the evaluation as follows:

> She had a Functional Capacity Evaluation which indicated that she is not able to return to her previous work.  Her work level tested out as a sedentary work level, being able to lift 10 pounds.  She is to do no frequent lifting even of this weight and she must maintain strict back and neck precautions.  She should be able to return to work but it would have to be at a sedentary level.  She does have a college degree so she should be able to be retrained in an

---

[34] *Id.* at 422.

[35] *Id.* at 416-419.

[36] *Id.* at 417.

[37] *Id.*

[38] *Id.* at 415.

11

alternate occupation.[39]

Defendant notified plaintiff by letter dated October 1, 1993, that it wanted her to participate in a rehabilitation program.[40] Defendant also contacted Dr. Stanley, Dr. Salmon, and Dr. Williams, plaintiff's newest physician, and requested copies of their office notes, as well as an update on the status of plaintiff's current medical condition.[41] Defendant hired an independent consultant to review the gathered materials and submit findings regarding plaintiff's condition.[42] The independent assessment concluded that plaintiff's "rehabilitation potential looks good at this time...."[43] The assessment also revealed that Dr. Williams had diagnosed plaintiff with a new medical condition, fibromyalgia, but that this condition would not restrict plaintiff from returning to work.[44] Additionally, the findings revealed that plaintiff had been awarded social security benefits on April 10, 1993, and that these benefits were retroactive to December 1992.[45] Defendant was not aware of the social security award prior to receiving the findings of their

---

[39] *Id.* at 415.

[40] *Id.* at 400.

[41] *Id.* at 388-391.

[42] *Id.* at 369-374.

[43] *Id.* at 373.

[44] *Id.*

[45] *Id.* at 373, 354-358.

independent consultant, and notified plaintiff that the plan provides for an offset of any benefits awarded under the Social Security Act.[46]  Defendant reduced plaintiff's benefits to recoup the amount overpaid.[47]

Plaintiff refused to return to work and claimed she remained totally disabled.[48]  Defendant also learned that she was participating in a fibromyalgia study conducted by Dr. John D. Mountz at the University of Alabama at Birmingham.[49]  Defendant's independent consultant contacted Dr. Mount and asked for his medical opinion as to whether plaintiff was totally disabled.[50]  Dr. Mountz responded in writing, and opined that she could not return to her previous position, but that she was not totally disabled.[51]

As a result of this opinion, as well as the previous opinions of her physicians, defendant notified plaintiff by letter that her long-term disability benefits were being terminated as of May 18, 1994.[52]  Defendant explained that plaintiff "no longer meet[s] the policy's definition of total disability."[53]

---

[46] *Id.* at 343-345.

[47] *Id.*

[48] *Id.* at 295, 316, 319, 326.

[49] *Id.* at 295.

[50] *Id.* at 305.

[51] *Id.* at 303.

[52] *Id.* at 289-290.

[53] *Id.* at 289.

By letter dated September 14, 1994, plaintiff requested that
defendant reconsider its decision to cancel her benefits.[54]  She
stated that Dr. Salmon's opinion had been a mistake, and that she
had contacted his office and asked him "to review [her] file and
rectify this problem."[55]  Plaintiff also promised to send recent
reports from Dr. Stanley and Laurence S. Bradley, Ph.D.
(specializing in pain psychology).[56]  Defendant acknowledged
plaintiff's appeal by letter dated September 23, 1994, and informed
her that they would review her claim once they received reports
from Dr. Bradley and Dr. Stanley.[57]

Dr. Salmon refused to reverse his previous medical conclusion,
and notified plaintiff of this decision by letter dated September
22, 1994.[58]

> You have extensive records and I have tried to review them.
> I did indicate on 11/1/93 that you were able to return to
> work at a modified duty.  You were unable to return to your
> previous occupation; but according to the [functional
> capacity evaluation], you could at least do sedentary work.
> . . .
>
> Anyone with musculoskeletal pain and especially fibromyalgia
> needs to be as active as possible and try to avoid
> disability.  One of your best hopes for improvement is
> working and getting back to as normal a lifestyle as

---

[54] *Id.* at 281-281.

[55] *Id.* at 281.

[56] *Id.*

[57] *Id.* at 277.

[58] *Id.* at 258

14

> possible.  You are too young to be permanently disabled so
> I urged you to try to work through this as much as possible.
> ...
>
> In summary, you are unable to return to your previous
> occupation but according to the FCE you are able to do at
> least sedentary work.[59]

Additionally, Dr. Bradley submitted an attending physician evaluation in October of 1994.[60] He stated that plaintiff suffered from fibromyalgia, and from "major depressive disorder, posttraumatic stress disorder, high levels of pain, fatigue, depression, [and] anxiety."[61] After receiving Dr. Bradley's report, defendant reinstated plaintiff's disability benefits on October 27, 1994.[62]

In January of 1995, defendant "began its standard 'change in definition' investigation since [plaintiff] would soon be required to demonstrate that she met the more stringent ... definition of Total Disability...."[63]  Specifically, if plaintiff received benefits beyond thirty-six months, she would have to demonstrate that she "is completely unable to perform the material duties of any and every gainful occupation or employment for which the person is or becomes reasonably fitted by education, training or

---

[59] *Id.*

[60] *Id.* at 272-275.

[61] *Id.* at 272.

[62] *Id.* at 261.

[63] Higgins' affidavit ¶ 17.

15

experience."[64]  As part of this investigation, defendant received another attending physician statement, dated May 9, 1995, from Dr. Bradley.[65]  He stated that plaintiff continued to suffer from fibromyalgia, as well as depression and anxiety.[66]

After receiving Dr. Bradley's evaluation, defendant decided to investigate the possibility that plaintiff was disabled due to a mental, rather than physical, condition.[67]  Defendant also requested that plaintiff submit to an independent medical examination with Dr. Cemil Cezayirli, a psychiatrist.[68]  Dr. Cezayirli confirmed that plaintiff was suffering from depression and concluded that "at this time she is not able to work," "but this doesn't mean she is going to remain permanently disabled."[69]

Defendant notified plaintiff, by letter dated September 14, 1995, that it considered her totally disabled due to her mental condition.[70]  Defendant also reminded plaintiff that the policy contained a 24-month limitation for disability benefits due to mental or nervous conditions.[71]

---

[64] Defendant's exhibit A at 12.
[65] Defendant's exhibit B at 225.
[66] *Id.*
[67] *Id.* at 223.
[68] *Id.* at 220.
[69] *Id.* at 199-201.
[70] *Id.* at 183-184.
[71] *Id.* at 183.

Based on your disabling condition of Major Depression and the policy provisions quoted above, benefits can only be considered for a maximum benefit period of twenty-four months or through 9/11/97.  We will continue to request periodic updates of certification for disability.[72]

On May 31, 1996, plaintiff submitted a supplementary report for benefits, which was completed, in part, by Dr. Gregory Meiman, M.D.[73]  Dr. Meiman classified plaintiff's physical impairment as "severely impaired" and her psychiatric impairment as "markedly limited."[74]  Plaintiff submitted a similar supplementary report on January 23, 1997, that repeated the earlier diagnosis of Dr. Meiman.[75]  Defendant terminated plaintiff's disability benefits on September 10, 1997.[76]

Plaintiff notified defendant, by letter dated October 7, 1997, that she desired to appeal its denial of disability benefits.[77]  In response to this notice, defendant reminded plaintiff that she needed "to provide medical documentation supporting your appeal."[78]  On September 3, 1998, nearly a year after her benefits were terminated, plaintiff forwarded a letter from Dr. Meiman to

---

[72] *Id.*

[73] *Id.* at 163-164.

[74] *Id.* at 164.

[75] *Id.* at 151-52.

[76] Plaintiff's affidavit at 3.

[77] Defendant's exhibit B at 134.

[78] *Id.* at 139, 135-136, 132-133.

defendant.[79]   In the letter, Dr. Meiman opined, without providing
supporting medical evidence, "that [plaintiff's] disability could
certainly result from [her] physical-medical problems alone and of
themselves, but the fact that she has had depression also has not
helped."[80]   Dr. Meiman indicated that plaintiff was troubled by
hyperlipidemia,[81] angina pectoris,[82] chronic fibromyalgia, and
permanent nerve damage to her neck and shoulder areas.[83]

   After reviewing Dr. Meiman's letter, defendant requested copies
of Dr. Meiman's medical records, as well as any other medical
evidence that substantiated plaintiff's claim that her physical
condition rendered her unable to return to work.[84]   After waiting
two months without receiving a response from plaintiff, defendant
notified her on December 8, 1998 that it was closing her file.[85]

   Defendant received copies of Dr. Meiman's medical records on
April 12, 1999,[86] of Dr. Bradley's records on May 11, 1999,[87] and of

---

[79] *Id.* at 130-31.

[80] *Id.* at 131.

[81] Dr. Meiman defined this condition as "an elevation of the blood fats."
*Id.*

[82] Dr. Meiman explained that angina pectoris "is a condition resulting from
hardening of the arteries in the heart itself."  *Id.*

[83] *Id.*

[84] *Id.* at 129.

[85] *Id.* at 128.

[86] *Id.* at 110.

[87] *Id.* at 97.

18

Dr. Stanley's records on May 18, 1999.[88] Defendant forwarded plaintiff's file to an independent review organization for an examination of plaintiff's physical disabilities.[89] The organization selected two physicians to examine plaintiff's file: Dr. Robert D. Petrie[90] and Dr. Andrew J. Porges, a board certified rheumatologist.[91] Dr. Petrie concluded that plaintiff's "fibromyalgia and cervical disease documents provided do not prevent Ms. Brown from performing sedentary work."[92] Dr. Porges likewise concluded that:

> Ms. Brown has fibromyalgia. In addition, records indicate that she has major depression, as well as an anxiety disorder. Psychiatric disorders are often a significant component of fibromyalgia, and this is well-documented in Ms. Brown's records by both the rheumatologist involved as well as the psychiatric clinic. ... However, in terms of the fibromyalgia itself, although this is a well-documented moderately-severe case, it does not prevent Ms. Brown from engaging in regular sedentary work. A specific recommendation was made by Dr. Salmon that a return to work in a limited capacity is of medical benefit to such individuals maintaining an active and productive lifestyle. I agree with this assessment.[93]

Thereafter, defendant requested an independent vocational expert to conduct a "Transferrable Skills Analysis" to determine whether

---

[88] *Id.* at 90.

[89] *Id.* at 86.

[90] *Id.* at 80.

[91] *Id.* at 83.

[92] *Id.* at 82.

[93] *Id.* at 83.

there were any possible occupations plaintiff could perform given her job history, education, residual functional capacities, and transferrable skills.[94]   Defendant also requested a "Labor Market Survey" to determine the availability of such jobs within a fifty mile radius of plaintiff's residence.[95]

The vocational expert submitted the results of her analysis by letter dated July 7, 1999.[96]   She opined that plaintiff was qualified for the following positions: social service aide; counselor; intake worker; customer service representative; and receptionist/information clerk.[97]   The salary ranges available for these jobs varied from $11,850 to $35,510, compared to the $22,402 average salary plaintiff earned in her previous occupation.[98]   The vocational expert also listed six positions available within fifty miles of plaintiff's current residence.[99]

Based on all "the medical and occupational information submitted to date," defendant denied plaintiff's appeal, concluding that plaintiff is not "considered physically disabled according to the

---

[94] *Id.* at 60.

[95] *Id.*

[96] *Id.* at 44-50, 53-55

[97] *Id.* at 54-55.

[98] *Id.* at 54-55, 491.

[99] *Id.* at 44-50.

above quoted definition of disability."[100]   Although plaintiff filed

a subsequent internal appeal of defendant's decision, it also was

denied.[101]     Accordingly,  plaintiff  filed  this  lawsuit,  as  all

internal complaints had been exhausted.

### III.  DISCUSSION

"ERISA  is  a  comprehensive  statute  designed  to  promote  the

interests of employees and their beneficiaries in employee benefit

plans."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90, 103 S.Ct.

2890, 2896, 77 L.Ed.2d 490 (1983).  Section 502(a)(1)(B) provides

that  "[a]  civil  action  may  be  brought  by  a  participant  or

beneficiary ... to recover benefits due to him under the terms of

his plan, to enforce his rights under the terms of the plan, or to

clarify  his  rights  to  future  benefits  under  the  terms  of  the

plan...."  29 U.S.C. § 1132(a)(1)(B).  Actions brought under this

section are considered equitable in nature, and participants are

not entitled to a jury trial.  *Hunt v. Hawthorne Associates, Inc.*,

119 F.3d 888, 907 (11th Cir. 1997).

> The nature of an action under section 502(a)(1)(B) is for
> the enforcement of the ERISA plan.  Although the plaintiffs
> assert that they are claiming money damages, in effect they
> are claiming the benefits they are allegedly entitled to
> under the plan.  Although ... a money judgment would satisfy
> their demands,  ...  only an order for continuing benefits

---

[100] *Id.* at 37-39.

[101] *Id.* at 6-7.

would be sufficient.    This is traditionally equitable
relief....

*Blake v. Unionmutual Stock Life Ins. Co. of America*, 906 F.2d 1525,

1526 (11th Cir. 1990).

ERISA does not specify, however, the appropriate standard of

review for actions under section 502(a)(1)(B).  *See Firestone Tire*

*& Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S.Ct 948, 953, 103

L.Ed.2d 80 (1989).   In *Firestone*, the Supreme Court established

that the "denial of benefits challenged under § 1132(a)(1)(B) is to

be reviewed under a *de novo* standard unless the benefit plan gives

the administrator or fiduciary discretionary authority to determine

eligibility for benefits or to construe the terms of the plan."

*Firestone*,  489 U.S. at 115, 109 S.Ct. at 956-57 (citations

omitted).  The Eleventh Circuit has interpreted the Supreme Court's

holding to allow for three separate standards of review.

> Consistent with the Court's directive in *Firestone*, we have
> adopted three standards of review for plan interpretations:
> (1) *de novo*, applicable where the plan administrator is not
> afforded discretion, (2) arbitrary and capricious when the
> plan grants the administrator discretion, and (3) heightened
> arbitrary and capricious where there is a conflict of
> interest.

*Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1449 (11th Cir.

1997) (citations omitted).  Here, all parties concede that *de novo*

review is the appropriate standard, and this court agrees, because

22

there is no evidence of discretion afforded to the administrator under the terms of defendant's plan.

Defendant argues that it is entitled to summary judgment, because plaintiff failed to offer sufficient medical evidence to prove that she was totally disabled within the meaning of the policy. Defendant contends that the provisions of the policy are unambiguous: in order for plaintiff to be awarded disability benefits after thirty-six months, she must prove that she is "completely unable to perform the material duties of any and every gainful occupation or employment for which [she] is or becomes reasonably fitted by education, training or experience."[102] According to defendant, plaintiff's "medical records do not indicate a continuous inability to engage in **any occupation**" as a result of the "physical problems with her heart and neck."[103] Rather, plaintiff only qualifies as totally disabled by virtue of her mental condition, and plaintiff has "previously exhausted the Plan's benefits for disability caused by mental disorder."[104]

> In this case the Plan clearly and unambiguously provides that benefits for any and all periods of disability due to a mental disorder are limited to a 24 month period. Fortis accepted liability for Ms. Brown's mental disorder in September of 1995 and paid her the benefits allowed under

---

[102] *See* defendant's exhibit A at 12.

[103] Defendant's brief (doc. no 19) at 20-21 (emphasis in original).

[104] *Id*. at 21.

23

> the Plan for a period of 24 months.  There is no provision
> allowing for payment of benefits for a mental disability of
> any kind beyond the 24 month limitation.  Plaintiff clearly
> does not meet the Plan's determination of Total Disability
> based solely upon her physical condition and offered no
> credible or reliable medical evidence to support a physical
> disability.  Plaintiff already received <u>all</u> benefits due
> under the Plan for a disability caused by a mental
> condition. [105]

Defendant requests the court to conclude as a matter of law that

plaintiff does not qualify for additional disability benefits under

its policy.

In rebuttal, plaintiff contends that defendant's policy is

ambiguous and, therefore, she is entitled to an award of benefits.

Although the plan limits an insured's benefits when they are

totally disabled by virtue of "alcoholism, drug addiction, chemical

dependency or mental or nervous disease or disorder," plaintiff

argues that the plan does not foresee the possibility that an

insured can be rendered disabled by a <u>combination</u> of physical and

mental conditions.  Should the court conclude that her physical

limitations, standing alone, do not qualify her as totally

disabled, plaintiff contends that the combined impact of her

physical and mental limitations clearly qualify her as incapable of

engaging in "any occupation."

The Eleventh Circuit has held that the rule of *contra*

---

[105] *Id.* at 23.

*proferentem*[106] should be applied in ERISA litigation when construing the meaning of a contractual provision. *See Collins v. American Cast Iron Pipe Company*, 105 F.3d 1368, 1371 (11th Cir. 1997); *Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1551 (11th Cir. 1994). That rule "requires [courts] to construe ambiguities against the drafter," *Lee*, 10 F.3d at 1551, and application of the rule in this case would dictate a construction against defendant. Whether a contract provision is ambiguous is an issue of law to be decided by the court. *See Stewart v. KHD Deutz of America*, 980 F.2d 698, (11th Cir. 1993). A provision is ambiguous if reasonable persons could disagree as to its meaning and effect. *See Kane v. Aetna Life Insurance*, 893 F.2d 1283, 1285 (11th Cir. 1990). "When one of these interpretations results in coverage and another results in exclusion, ambiguity exists in the insurance policy." *Dahl-Eimers v. Mutual of Omaha*, 986 F.2d 1379, 1381-83 (11th Cir. 1993). Moreover, silence can form the basis of an ambiguity. *Id.*

Defendant's policy limits its maximum benefits to two years for "disabilities <u>due to</u> any one or more of the above conditions."[107] Those conditions include "alcoholism, drug addiction, chemical

---

[106] The doctrine that, when interpreting documents, ambiguities are to be construed most strongly against the drafter. *See* Black's Law Dictionary 328 (7th ed. 1999).

[107] Defendant's exhibit A at 17 (emphasis supplied).

dependency, or <u>mental or nervous disease or disorder</u>."[108]   The

policy, however, fails to define either the phrases "due to," or

"mental disease or disorder" and, accordingly, the court concludes

that it is ambiguous.

First, the policy fails to identify what types of disabilities

are classified as "mental."   The policy does not distinguish

between a "mental or nervous disease or disorder" that "is non-

organically caused," and one that arises as a direct consequence of

an underlying organic illness or physical condition.   In this case,

one of defendant's own consultants acknowledged that plaintiff's

depression was a common side-effect of fibromyalgia.   Specifically,

Dr. Porges commented:

> Ms. Brown has fibromyalgia.   In addition, records indicate
> that she has major depression, as well as an anxiety
> disorder.   <u>Psychiatric disorders are often a significant
> component of fibromyalgia, and this is well-documented in
> Ms. Brown's records by both the rheumatologist involved as
> well as the psychiatric clinic</u>. [109]

In *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948 (9th Cir.

1993), the Ninth Circuit concluded under similar circumstances that

the term "mental disorder" was ambiguous.   In that case, the

plaintiff filed a claim for total disability due to his severe

headaches. *See Patterson*, 11 F.3d at 949.   Although the insurance

---

[108] *Id.* (emphasis supplied).

[109] Defendant's exhibit B at 83.

company found him totally disabled and paid him benefits, they discontinued the benefits after two years on the grounds that plaintiff's disability was mental rather than physical. *Id*. The plaintiff's policy limited benefits for any disability "caused by or resulting from ... [m]ental, nervous or emotional disorders of any type," but did not define the term "mental disorder." *Id*. at 950. The district court entered judgment in favor of the insurance company, but the Ninth Circuit reversed, holding that the term "mental disorder" was ambiguous. *Id*. at 951. The court reasoned:

> First, the Plan does not specify whether a disability is to be classified as "mental" by looking to the cause of the disability or to its symptoms. Since the ambiguity is to be resolved in Patterson's favor, his disability is not a mental disorder subject to the two-year limitation on payments if it is either manifested by headaches though caused by depression, or caused by headaches but manifested by depression.

> Second, the Plan does not make clear whether a disability qualifies as a "mental disorder" when it results from a combination of physical and mental factors. ... Patterson's disability may result solely from depression, or solely from headaches, or from a combination of the two. Since this ambiguity must also be resolved in Patterson's favor, he is not within the limitation for mental disorders if his disability is caused in any part by headaches.

*Id*. at 950.

Likewise, the Seventh Circuit has also held that it had "no trouble" finding the term "mental illness" to be ambiguous when

27

applied to individuals who suffer from psychic disorders
precipitated by organic illnesses. *See Phillips v. Lincoln
National Life Insurance Company*, 978 F.2d 302, 310-311 (7th Cir.
1992). The court explained:

> [H]ere[,] the Plan "contains no definition or explanation of
> the term 'mental illness,' and offers no illustration of the
> conditions that are included or excluded.   Nor does the
> policy contain any language suggesting whether the cause or
> the manifestation [of an illness] determines whether an
> illness is covered...." ... We thus hold that the Plan term
> "mental illness' is ambiguous as applied to individuals like
> [plaintiff] who have mental disorders caused by organic
> illnesses.

*Phillips*, 978 F.2d at 311 (citations omitted).

This court is persuaded by the reasoning of the Ninth and
Seventh circuits, and finds that their analysis is the appropriate
one to be applied in the instant case.   In so adopting these
holdings, the court notes that the Eleventh Circuit has yet to
address this issue,[110] and that other circuits have taken an

---

[110] In *Blake v. Unionmutual v. Stock Life Insurance Company of America*, 906
F.2d 1525 (11th Cir. 1990), a panel of the Eleventh Circuit adopted the district
court's opinion that the mental illness limitation in the insurance policy
applied to plaintiffs' claims.   The court applied the limitation, however,
because the plaintiffs failed "to prove an organic causation for this illness,"
and because "the treatment Mrs. Blake received is only more convincing proof that
she suffered a mental illness." *Blake*, 906 F.2d at 1530.   The court described
how "[a]ll of the hospitalizations of Mrs. Blake were in psychiatric units" and
that "[s]he was treated primarily by psychiatrists receiving well recognized
psychiatric treatment." *Id*.   These facts are clearly distinguishable from the
facts at hand, however, because Mrs. Brown has undeniably been diagnosed with
organic illnesses, such as fibromyalgia, cervical disease, coronary artery
disease.

opposing view of the term "mental illness."  *See Brewer v. Lincoln National Life Insurance Company*, 921 F.2d 150 (8th Cir. 1990) (concluding that undefined terms in a policy "should be accorded their ordinary, and not specialized, meanings"); *see Lynd v. Reliance Standard Life Insurance Company*, 94 F.3d 979 (5th Cir. 1996) (adopting the approach taken in *Brewer* and deciding that "depression is a 'mental disorder,' irrespective of its physical causes or symptoms").

Additionally, the court finds that this policy does not interpret the phrase "due to" and, therefore, does not consider the possibility that a plaintiff may suffer from a combination of both physical and mental impairments.  As the Tenth Circuit recently observed:

> The phrase "due to" is ambiguous.  "The words do not speak clearly and unambiguously for themselves.  The causal nexus of 'due to' has been given a broad variety of meanings in the law ranging from sole and proximate cause at one end of the spectrum to contributing cause at the other." ...

*Kimber v. Thiokol Corporation*, 196 F.3d 1092, 1100 (10th Cir. 1999) (citation omitted).  When a plaintiff has both medically diagnosed medical disorders, as well as mental disorders, and neither condition, standing alone, render her completely unable to work, but the combination of the two infirmities render her totally

29

disabled, it is difficult, at best, to determine whether her disability is "due to" her psychic _versus_ her physical condition.

Having concluded that the limitation applicable to "mental or nervous disease or disorder" is ambiguous and, therefore, inapplicable to plaintiff, the only remaining issue is whether plaintiff is totally disabled under the terms of defendant's policy. Such a decision must be made by considering all of plaintiff's disabilities — her physical as well as her mental — and whether they render her "completely unable to perform the material duties of any and every gainful occupation or employment for which [she] is or becomes reasonably fitted by education, training or experience."

The court declines, however, to decide this issue on summary judgment for the following reasons. First, plaintiff's own physicians have provided conflicting opinions as to whether her combined physical and mental conditions render her totally disabled. Although plaintiff's most recent physician, Dr. Meiman, and the psychiatrist hired by defendant, Dr. Cezayiril, have deemed her to be totally disabled due to the combination of conditions, this fact is disputed by some of plaintiff's early physicians, especially Dr. Salmon.[111] Therefore, unless the parties are able to

---

[111] Moreover, both of defendant's consultants have concluded that she is not

resolve this issue through mediation, the court will entertain this matter at a non-jury trial.

### IV.   CONCLUSION

Based on the foregoing, the court concludes that the provision contained in defendant's policy limiting disability benefits to 24 months due to "mental or nervous disease or disorder" is ambiguous and, thus, inapplicable to plaintiff. Accordingly, the court finds that defendant's motion for summary judgment is due to be denied. Plaintiff's motion for summary judgment is due to be granted in part and denied in part. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

**DONE** this _5th_ day of June, 2000.

United States District Judge

---

totally disabled, and the vocational expert has identified several alternative occupations for plaintiff. The court is inclined to disregard this evidence, however, because their conclusions were based solely on plaintiff's physical limitations.

31